UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
RICARDO FLEURIMOND and SAVERIA
FECENTESE, as Administrator of the Estate of
SAVINO DIGIOSA,

                Plaintiffs,

- against -

RODNEY HOLDER, HONG LOW, JOHN
WRIGHT, CHRISTINE ABRIL, SHEILA
BENJAMIN, and the CITY OF NEW YORK,

                Defendants.
-------------------------------------------------------------x

**MEMORANDUM & ORDER**
16-CV-750 (PKC) (ST)

PAMELA K. CHEN, United States District Judge:

Plaintiffs Ricardo Fleurimond and Savino Digiosa ("Plaintiffs")[1] bring this action against

Defendants Rodney Holder ("Holder"), Hong Low ("Low"), John Wright ("Wright"), Christine

Abril ("Abril"), Sheila Benjamin ("Benjamin"), and the City of New York (collectively,

"Defendants"), advancing claims under 42 U.S.C. § 1983 for malicious prosecution and municipal

liability. Defendants move for summary judgment on all of Plaintiffs' claims. For the following

reasons, the Court grants Defendants' motion for summary judgment in its entirety and dismisses

this action.

---

[1] This action was filed on February 12, 2016. (*See* Complaint ("Compl."), Dkt. 1.) On October 26, 2016, Defense Counsel informed the Court that Plaintiff Digiosa had passed away. (Dkt. 15.) Saveria Fecentese, the executor of Digiosa's estate, was substituted for Digiosa in this action pursuant to Federal Rule of Civil Procedure 25(a)(1). (Dkt. 20.) Notwithstanding this substitution and for the sake of clarity, the Court refers to Digiosa as a Plaintiff in this Memorandum & Order.

# BACKGROUND

## I.     Facts

### A.     The Taking of the Air Conditioners

During the events at issue in this case, Plaintiffs Fleurimond and Digiosa were employed as City Laborers within the New York City Department of Health and Mental Hygiene ("DOHMH"). (Defendant's 56.1 Statement[2] ("Defs' 56.1"), ¶¶ 3–4; Deposition of Ricardo Fleurimond ("Fleurimond Dep."), Dkt. 60-1, at ECF[3] 448.)[4] As City Laborers, Plaintiffs regularly worked together as partners and completed work assignments that required them to pick up and deliver items between DOHMH locations. (Defs.' 56.1, ¶¶ 15–16.) Plaintiffs were each assigned a DOHMH work van, which they used both to travel to and from work, and to complete tasks during their work shifts. (Id. ¶ 17.) In October of 2012, the Kingsland Warehouse—a storage space for DOHMH supplies—flooded as a result of Hurricane Sandy, and the ground floor was

---

[2] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citation to a party's 56.1 statement incorporates by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document. The Court has deemed facts averred in a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed. *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)). Additionally, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement. *Risco v. McHugh*, 868 F. Supp. 2d 75, 87 n.2 (S.D.N.Y. 2012).

[3] "ECF" refers to the "Page ID" number generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[4] City Laborers "do all the moving jobs for the [C]ity of New York or for the [New York City] Health Department," such as delivering supplies and disposing of unneeded items. (Fleurimond Dep., Dkt. 60-1, at ECF 448.)

considerably damaged. (*Id.* ¶¶ 6, 8; Fleurimond Dep., Dkt. 60-1, at ECF 483–84.) The Kingsland Warehouse was subsequently closed for several months so that it could be repaired. (Deposition of Rodney Holder ("Holder Dep."), Dkt. 60-2 at ECF 655.)

On February 25, 2013, Plaintiffs were given a written invoice at the DOHMH garage instructing them to pick up supplies at the Kingsland Warehouse. (Defs.' 56.1, ¶ 18.) When Plaintiffs arrived at the Kingsland Warehouse, they encountered Defendant Holder, whom they referred to by his nickname, "Kenny." (*Id.* ¶ 20; Plaintiffs' 56.1 Statement ("Pls.' 56.1"), Dkt. 59, ¶ 20; Fleurimond Dep., Dkt. 60-1, at ECF 482.)[5] Holder called Defendant Abril, Director of Materials Management at DOHMH (Defs.' 56.1, ¶ 5), to tell her that Plaintiffs were at the Kingsland Warehouse to pick up supplies (*id.* ¶ 23). Abril then directed Defendant Low, a DOHMH stock worker at the Kingsland Warehouse (*id.* ¶ 12), to go to the Kingsland Warehouse and instruct Plaintiffs on how to transport various items described on the invoice to a different location (Deposition of Christine Abril ("Abril Dep."), Dkt. 60-3, at ECF 683; Defs.' 56.1, ¶ 24). Holder told Plaintiffs to wait for Low on the loading dock at the Kingsland Warehouse. (Defs.' 56.1, ¶ 25.)

The details of the subsequent interaction that took place between Defendant Holder and Plaintiffs are disputed. While waiting on the loading dock, Plaintiffs observed stacks of about 75

---

[5] During the events at issue in this case, Defendant Holder worked as a Records Aide for DOHMH and was responsible for receiving, storing, and locating documents and records. (Defs.' 56.1, ¶ 10.) Plaintiff Fleurimond was under the impression that Holder was "above" him in the chain of command at DOHMH and that Holder had the authority to decide which items were to be transported to and from the Kingsland Warehouse. (Fleurimond Dep., Dkt. 60-1, at ECF 495–96.) According to Fleurimond, Plaintiffs believed Holder was a DOHMH supervisor because of paperwork they had received, including an invoice, which identified him as such. (*Id.*)

to 100 air conditioners in boxes. (*Id.* ¶ 26.)[6] At deposition, Plaintiff Fleurimond testified that he asked Holder whether he could take a couple of air conditioners for himself and Holder replied that the air conditioners were "going in the garbage" and that Fleurimond could "do whatever [he] want[ed] to do." (Fleurimond Dep., Dkt. 60-1 at ECF 486; *see also id.* at ECF 538 ("[Holder] said [the air conditioners are] going to go in the garbage, that's [what] you guys are coming here for anyway, to throw them away, they're salvage,[7] so yes, you can take one or whatever you want."). According to Holder, Plaintiffs asked if the air conditioners were going to be "put in the garbage" and the exact phrase Holder said in response was that "the only thing that I know about, are my records." (Holder Dep., Dkt. 55-4, at ECF 302.) Intending to take the air conditioners home for their personal use (Defs.' 56.1, ¶ 31), Plaintiffs loaded five of the air conditioners into Plaintiff Fleurimond's work van and two of the air conditioners into Plaintiff Digiosa's work van (*id.* ¶ 30). At deposition, Fleurimond testified that Holder helped Plaintiffs transport the air conditioners from the loading dock into Fleurimond's and Digiosa's work vans. (Fleurimond Dep., Dkt. 60-1, at ECF 490.) Completely denying this version of events, Holder testified at deposition that (1) he never helped Plaintiffs load the air conditioners into their work vans, (2) he never saw Plaintiffs loading the air conditioners into their work vans, and (3) he never saw the air conditioners in Plaintiffs' work vans at any point in time. (Holder Dep., Dkt. 60-2, at ECF 658.)

Shortly after Plaintiffs finished loading the seven air conditioners into their respective work vans, Defendant Low arrived. (Defs.' 56.1, ¶ 32.) Low identified the supplies Plaintiffs were

---

[6] At deposition, Plaintiff Fleurimond testified that some of the boxes were "open because of water damage" (Fleurimond Dep., Dkt. 60-1, at ECF 488–89), but conceded that the five air conditioners he intended to take home for private use were in boxes that were unopened (*id.* at ECF 490).

[7] "Salvage" refers to items that are or will be "throw[n] [into] the garbage" or otherwise disposed of with no anticipated future use. (*Id.* at ECF 470.)

4

assigned to transport and helped load those supplies into Plaintiffs' work vans. (*Id.* ¶ 33.) In the process, Low observed the air conditioners in the back of Plaintiffs' work vans, but made no mention of the air conditioners to Plaintiffs. (*Id.* ¶ 34; Pls.' 56.1, ¶ 34.) After Plaintiffs left the Kingsland Warehouse, Low contacted Defendant Wright—supervisor of stock workers at the Kingsland Warehouse (Defs.' 56.1, ¶ 13)—and told him about the air conditioners that he saw in Plaintiffs' work vans (*id.* ¶ 36). Wright then called Defendant Abril and told her that Low "said that there was a problem when [Low] was loading one of the vans" and "that [Low] saw some of the air conditioners." (Abril Dep., Dkt. 60-3, at ECF 682–83.) Abril "first contacted the Bureau of Labs,"[8] which owned the air conditioners, "to see if they possibly sent someone for air conditioners and forgot to notify" her. (*Id.* at ECF 683.) After the Bureau of Labs confirmed that it had not sent anyone for the air conditioners, Abril "called Roy Meade[9] to [ask] the same thing, if he had sent some drivers for air conditioners that [she] was unaware of and he said no." (Abril Dep., Dkt. 60-3, at ECF 683.) Abril told Roy Meade to check to see if the air conditioners had indeed been removed from the Kingsland Warehouse and, if so, to ensure that they were promptly returned. (*Id.* at ECF 684.)

Defendant Wright then called Plaintiff Fleurimond and told him to return the air conditioners to the Kingsland Warehouse. (Defs.' 56.1, ¶ 39.) Fleurimond subsequently called Plaintiff Digiosa and told him to return the two air conditioners Digiosa had taken. (*Id.*) At deposition, Fleurimond summarized the events as follows:

> [Wright] said they said you weren't supposed to take the ACs, so bring them back. I said yeah, but [Holder] gave them [to] me. I mean, I call [Holder] Kenny or something. Whatever I call him. [Holder] said yeah, I can have it. [Wright] said

---

[8] The record is unclear as to what the "Bureau of Labs" is.

[9] During the events at issue in this case, Roy Meade was Plaintiffs' direct supervisor. (Fleurimond Dep., Dkt. 60-1, at ECF 466.)

all right, but they found out you guys weren't supposed to take it, so bring them back. I said all right. So that's when I called Digiosa. I said I just received a phone call from [Wright], he said for us to bring them back, you know. And you know, Digiosa said what do you mean they said bring them back? I said, yeah, they said they found out we weren't supposed to take them, to bring them back. So I rela[y]ed the message to Digiosa, so then I called [Wright]. I said I got like two more stops left, can I bring them back the same day once I'm done[?] He said, well, to be honest with you—they close early. They close at 3 and we punch out at 3:30. He said the best thing for you to do is bring them back in the morning, because by the time we get there they're closed. So we took the ACs—well, I took the AC—the AC was in my van and I drove home.

(Fleurimond Dep., Dkt. 60-1, at ECF 498–99.) After Plaintiffs finished work for the day, they traveled to their respective homes in their DOHMH work vans, where the air conditioners remained overnight. (Defs.' 56.1, ¶¶ 41–42; Fleurimond Dep., Dkt. 60-1, at ECF 497.) Plaintiffs returned the air conditioners to the Kingsland Warehouse the following morning. (Defs.' 56.1, ¶ 43.)

## B. The Prosecution

On the day of the incident, February 25, 2013, Defendant Abril contacted Defendant Benjamin, DOHMH Deputy Assistant Commissioner and Abril's direct supervisor (*id.* ¶ 14), and informed her "about the missing air conditioners" (*id.* ¶ 40; Abril Dep., Dkt. 60-3, at ECF 684). Benjamin told Abril to "file a report with health police."[10] (*Id.*) The next day, February 26, 2013— after speaking with Benjamin but before initiating contact with the DOHMH police—Abril came to learn that Plaintiffs had returned the air conditioners. (*Id.*) Abril nevertheless complied with Benjamin's instruction and reported Plaintiffs' removal of the air conditioners to DOHMH police later that day. (Defs.' 56.1, ¶ 44.) At deposition, Abril suggested that she believed that Plaintiffs only returned the air conditioners because of her direction to do so, communicated to Plaintiffs

---

[10] At deposition, Abril clarified that the "health police" are police officers who work specifically for DOHMH. (*Id.* at ECF 684.)

through their immediate supervisor, and that Plaintiffs' return of the units did not therefore affect Abril's belief that Plaintiffs had initially taken the air conditioners without authorization and that this conduct constituted theft of DOHMH property. (*See* Abril Dep., Dkt. 60-3, at ECF 684 ("I had told [Roy Meade] if you could please call [Plaintiffs] to see [if they have the missing air conditioners], and if they do, please return them.").)

The DOHMH Complaint identified Abril as the reporter of the crime, the relevant offenses as Grand Larceny in the Fourth Degree and Criminal Possession of Stolen Property in the Fourth Degree, and the victim of the crime as DOHMH. (*See* DOHMH Complaint Report, Dkt. 55-6, at ECF 306.) Additionally, the DOHMH Complaint identified Plaintiffs as the culprits and contained the following "description of incident" prepared by DOHMH Investigator Lester Lloyd ("Lloyd"):

> The reporter [Abril] informed NYC DOHMH Police that [from February 22, 2013 through February 26, 2013] the listed items [seven air conditioners] were removed without permission or authority from the listed location [DOHMH loading dock]. [Plaintiffs] are the individuals that possessed the listed items without permission or authority when returning to the listed location.

(*Id.*; Defs.' 56.1, ¶ 45.) On February 26, 2013, after reporting the incident to DOHMH police, Abril informed Benjamin that the air conditioners had been returned. (Abril. Dep., Dkt. 60-3, at ECF 684.) Benjamin directed Abril to report the incident to the New York City Police Department ("NYPD"). (*Id.*)

Three days later, on March 1, 2013,[11] Defendant Abril—at the direction of Benjamin and other individuals from DOHMH "upper management"—went to the NYPD's 94th Precinct and made a complaint about the removal of the air conditioners from the warehouse. (Defs.' 56.1,

---

[11] There were 28 days in February 2013. *See* 2013 Calendar, https://www.calendar-365.com/2013-calendar.html (last visited on Aug. 21, 2019). The incident occurred on Monday, February 25, 2013. Abril reported it to DOHMH police on Tuesday, February 26, 2013 and to the NYPD that Friday, March 1, 2013. (Defs.' 56.1, ¶¶ 22–30, 44, 46.)

¶ 46; Abril Dep., Dkt. 60-3, at ECF 684.) At deposition, Abril testified that she gave the NYPD "the full story of what was told to me, what everyone else had said, the information regarding the air conditioners, [and] the money value" of the air conditioners. (*Id.* at ECF 685.) NYPD officers then spoke to Defendants Holder and Low as part of an investigation into the alleged crime. (Defs.' 56.1, ¶ 48.) A formal criminal complaint report, dated March 1, 2013, was then created. (*Id.*) This complaint contained a narrative portion that provided as follows:

> AT T/P/O C/V STATES THAT THE ABOVE SEVEN NEW AIR CONDITIONERS WERE STOLEN FROM THE ABOVE LOCATION. THE REPORTER STATES THAT THE ABOVE WITNESSES DID OBSERVE THE ABOVE[-]MENTIONED PERPS AS THEY DROVE AWAY WITH THE STOLEN PROPERTY. THE REPORTER STATES THAT THE ABOVE PERPS ARE EMPLOYED BY THE NYC HEALTH DEPARTMENT AND ARE KNOWN FOR TAKING THINGS IN THE PAST. *THE REPORTER STATES THAT PERPS BROUGHT BACK THE STOLEN MERCHANDISE, UPON BEING CONFRONTED BY A SUPERVISOR AT ANOTHER LOCATION.* REPORTER STATES THAT THE PERPS TOOK ADVANTAGE OF THE FACT THAT SURVEILLANCE CAMERAS WERE RECENTLY REMOVED FROM THE LOCATION.

(NYPD Complaint Report, Dkt. 55-7, at ECF 307–08 (emphasis added).) The complaint identified Holder as a witness to the alleged crime (*id.* at ECF 308), Low as a reporter of the alleged crime (*id.* at ECF 309), and Plaintiffs Fleurimond and Digiosa as the perpetrators (*id.* at ECF 309–10). The crime identified in the complaint was Grand Larceny. (*Id.* at ECF 307.)

On March 15, 2013, Plaintiffs were arrested for Grand Larceny in the Fourth Degree and Criminal Possession of Stolen Property in the Fourth Degree. (Defs.' 56.1, ¶ 50; NYPD Arrest Reports, Dkt. 55-8, at ECF 313–18.) Before arraignment, Fleurimond was incarcerated for 16 hours and eight minutes and Digiosa was incarcerated for 12 hours and 44 minutes. (Defs.' 56.1, ¶ 51.) On the day of Plaintiffs' arrest, the Kings County District Attorney's Office charged them with Attempted Criminal Possession of Stolen Property in the Third, Fourth and Fifth degrees.

(*Id.* ¶ 52.) The charging instrument was signed by NYPD Detective John Gipson, on information from non-defendant Lloyd (the DOHMH Investigator) and Defendants Low and Holder. (*Id.*)

The Kings County District Attorney's Office then presented Plaintiffs' criminal case to a grand jury, before which Defendants Abril, Holder, and Low all testified. (*Id.* ¶ 53.) Although the grand jury voted to indict Plaintiffs for Petit Larceny and Grand Larceny in the Fourth Degree (*id.* ¶ 54), Plaintiffs' criminal charges were ultimately dismissed on a motion of the District Attorney's Office (*id.* ¶ 55). The Certificates of Disposition issued by the Kings County Criminal Court were sealed pursuant to New York Criminal Procedure Law § 160.50. (Criminal Dispositions, Dkt. 55-11, at ECF 325–26.)

### C.  The Arbitration

On March 19, 2013, Plaintiffs Fleurimond and Digiosa were suspended from their jobs at DOHMH for 30 days for removing department property without authorization. (Defs.' 56.1, ¶ 56.) After the 30 days elapsed, Plaintiffs were put on paid suspension until June 28, 2013, when their employment was terminated. (*Id.* ¶ 57.) Plaintiffs subsequently challenged the termination of their employment through arbitration pursuant to the terms of a collective bargaining agreement entered into between Plaintiffs' labor union and DOHMH. (*Id.* ¶ 58.) Defendants Abril, Holder, and Low, and Plaintiffs all testified at the arbitration proceedings. (*Id.* ¶ 59.)

On September 8, 2014, Arbitrator James A. Brown (the "Arbitrator") issued an opinion in which he (1) found that Plaintiffs' testimony that Defendant Holder gave Plaintiffs permission to take the air conditioners was more credible than Holder's denial that he ever gave such permission, and that (2) Plaintiffs "sincerely believed that Holder was a supervisor because he opened the [Kingsland] Warehouse gate for them that morning and had also signed off on their paperwork in

the past." (Arbitration Opinion & Award, Dkt. 55-12, at ECF 338.) Nevertheless, the Arbitrator reasoned:

> Having established that [Plaintiffs] asked for—and received—Holder's permission to take the air conditioners, the analysis is only half complete. Even with Holder's permission, [Plaintiffs] should have known not to take the air conditioners. They had firsthand knowledge that not all [Kingsland] Warehouse supplies were "garbage" if only because they were picking up [Kingsland] Warehouse supplies (bond paper) that day. Moreover, [Plaintiffs] clearly believed the boxed air conditioners were fully operable or they would not have taken the seven units. In addition, [Plaintiffs] knew [DOHMH's] salvage process for officially discarding unwanted property . . . . It is significant that neither [Plaintiff] claimed that the air conditioners were being salvaged that day. Moreover, Fleurimond in 2012 had been directed by [DOHMH] Police to write a statement in connection with [DOHMH] property he took home and later had to return because he did not receive proper authorization to take it.[12]
>
> Thus, [Plaintiffs'] decision to take the boxed air conditioners reflected extremely poor judgment given that the units were still functional and not, at any rate, being salvaged. Simply stated, [Plaintiffs] should have known that Holder's "permission" did not equate to "authorization" to take Department property. Thus, I find that [Plaintiffs] are guilty of violating Department Rule 3.25[13] because "while on duty and without authorization [they] removed air conditioner units from the Kingsland Warehouse."

(*Id.* at ECF 339.)

The Arbitrator went on to find that termination of Plaintiffs' employment was not warranted and determined that Plaintiffs should be reinstated in their prior positions at DOHMH without any loss of seniority, but without backpay. (*Id.* at ECF 340.) DOHMH subsequently reinstated Plaintiffs' employment. (Defs.' 56.1, ¶ 64.)

---

[12] At deposition, Plaintiff Fleurimond explained that there was one incident that took place about six or seven months prior to the events at issue in this case in which he was investigated for removing a box of computer parts from the Kingsland Warehouse. (Fleurimond Dep., Dkt. 60-1, at ECF 571–73.)

[13] DOHMH Department Rule 3.25 covers "[c]onduct prejudicial to good order and discipline." (Arbitration Opinion & Award, Dkt. 55-12, at ECF 329.)

## II.    Procedural History

On February 12, 2016, Plaintiffs commenced this action, advancing claims of false arrest, malicious prosecution, and municipal liability under 42 U.S.C. § 1983,[14] as well as negligent hiring, training, and supervision under state law. (*See generally* Compl.)[15] The parties entered into discovery and attempted to settle their case without success. (*See* Dkts. 20–46.) On June 15, 2018, Defendants sought leave to file a motion for summary judgment (Dkt. 44), after which Plaintiffs voluntarily dismissed their false arrest and state law claims (Dkt. 46). On July 16, 2018, the Court granted Defendants leave to file their motion for summary judgment. (*See* July 16, 2018 ECF Entry.) Defendants' motion was fully briefed on November 19, 2018.

---

[14] Plaintiffs' complaint appears to additionally advance a claim of false imprisonment. (*See* Compl., ¶ 1 & ECF 11.) The Court treats any such claim as inseparable from Plaintiffs' false arrest claim. *See Boyd v. City of New York*, 336 F.3d 72, 76 n.6 (2d Cir. 2003) ("As goes false arrest, so goes [the plaintiffs'] false imprisonment claim."). Moreover, Defendants' June 15, 2018 letter to the Court referenced a "failure to intervene" claim. (*See* Dkt. 44, at ECF 153.) After reviewing the complaint, the Court is unable to discern any such claim, but notes that Plaintiffs label one of their § 1983 claims as brought against Defendants for "FAILING TO PROTECT" Plaintiffs "FROM UNCONSTITUTIONAL HARM." (Compl., at ECF 8–9 & ¶¶ 41–44.)

To the extent Plaintiffs have not abandoned this claim (Dkt. 46), the Court dismisses it. "[A] cognizable failure to protect claim under § 1983" sounds in the Eighth Amendment and requires a plaintiff to "show that he is incarcerated under conditions posing a substantial risk of serious harm" and that "prison officials acted with deliberate indifference to [his] safety." *Warren v. Goord*, 476 F. Supp. 2d 407, 410 (S.D.N.Y. 2007) (quotations omitted). Accordingly, "[t]he Eighth Amendment bar to cruel and unusual punishment does not apply to Plaintiff[s] because [they] were not []prisoner[s]" during the events at issue in this case, but were—at most—"simply being held at the police station." *Sanaberia v. Detective Shawn Tezlof*, No. 11-CV-6578 (NSR), 2016 WL 4371750, at *6 (S.D.N.Y. Aug. 12, 2016). Finally, even liberally construing this claim as one for failure to intervene, it would still be dismissed because of the absence of any surviving constitutional claim. *See infra*; *Soto v. City of New York*, 132 F. Supp. 3d 424, 459 (E.D.N.Y. 2015) ("Plaintiff's failure to intervene claim fails as a matter of law, because there is no underlying constitutional violation.").

[15] Although DOHMH, the Kings County District Attorney's Office, the NYPD, and John Doe Police Officers were initially named as defendants (Compl., at ECF 1 & ¶¶ 16–18), Plaintiffs subsequently dismissed their claims against these parties (Dkt. 46).

## STANDARD OF REVIEW

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the non-moving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the non-moving party is insufficient; "there must be evidence on which the jury could reasonably find for the" non-movant. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation omitted). In other words, "[t]he non[-]moving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quotation omitted).

When assessing whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). However, "the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48.

## DISCUSSION

### I. Malicious Prosecution

Plaintiffs advance malicious prosecution claims against Defendants Holder, Low, Wright, Abril, and Benjamin. "In order to prevail on a § 1983 claim against a state actor[16] for malicious prosecution, a plaintiff must show a violation of [his] rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted). To prevail on a malicious prosecution claim under New York law, "a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor;[17] (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* at 161 (quotations omitted).

---

[16] To prove a violation of § 1983, a plaintiff must demonstrate that "defendants violated [the] plaintiff's federal rights while acting under color of state law." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014). Defendants do not dispute that, as employees and/or officials of DOHMH—a state agency—they acted under color of state law for purposes of § 1983. Nevertheless, the Court notes that "the purpose of § 1983 is to deter state actors *from using their badge of authority* to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992); *see also Morton v. City of Albany*, No. 08-CV-1304 (TJM) (RFT), 2009 WL 2568595, at *5–6 (N.D.N.Y. Aug. 19, 2009) (concluding that a police officer did not act under color of law for purposes of § 1983 when he pointed his gun at his subordinate civilian employee). Because Defendants do not argue that they were not acting under color of state law with respect to the events at issue in this case, the Court does not address this reasoning.

[17] In their reply brief, Defendants argue that, in light of *Lanning v. City Glens Falls*, 908 F.3d 19 (2d Cir. 2018), which the Second Circuit decided on November 7, 2018, "[P]laintiffs cannot establish the favorable termination prong of the malicious prosecution standard" because "[t]he evidence of record indicates that [P]laintiffs' prosecution was terminated on motion of the DA's Office" and "there is no evidence that the circumstances of the termination related to any

In addition to arguing that probable cause existed to initiate prosecution against Plaintiffs, Defendants also assert a defense of qualified immunity based on the existence of "arguable probable cause." (Defendants' Opening Brief, Dkt. 53, at ECF 195–96); *Cortes v. City of New York*, 148 F. Supp. 3d 248, 254 (E.D.N.Y. 2015). A defendant is entitled to qualified immunity under federal law if "(1) the defendant's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for the defendant to believe his actions were lawful at the time of the challenged act." *Tooly v. Schwaller*, 919 F.3d 165, 172 (2d Cir. 2019) (quotation and brackets omitted). As the Supreme Court explained in *Plumhoff v. Rickard*, 572 U.S. 765 (2014):

> An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate. In addition, we have repeatedly told courts not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

*Id.* at 778–79 (quotations, citations, and alterations omitted); *see also Drimal v. Tai*, 786 F.3d 219, 224–25 (2d Cir. 2015) ("Qualified immunity . . . provides ample protection to all but the plainly

---

finding indicating actual innocence." (Defendants' Reply Brief, Dkt. 56, at ECF 356–57.) *Lanning*—which was issued after Defendants served their opening brief but before they served their reply (*compare* Dkt. 48 (service of opening brief on August 31, 2018), *with* November 9, 2018 ECF Entry & Dkt. 56 (service of reply brief on November 19, 2018))—clarified that "where a dismissal in the interest of justice leaves the question of guilt or innocence unanswered, it cannot provide the favorable termination required as the basis for [a malicious prosecution] claim." 908 F.3d at 28–29 (quotations and alterations omitted). The Court declines to consider this argument, "raised in a reply brief for the first time," because Plaintiffs have not had "an adequate opportunity to respond to it." *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) (quotation omitted). In any event, the Court concludes, for the reasons discussed *infra*, that summary judgment in favor of Defendants is appropriate on separate grounds.

incompetent or those who knowingly violate the law. To lose immunity, an official must violate a right, the contours of which are sufficiently clear that a reasonable official would understand that what he is doing violates that right." (quotation and citation omitted)).

"[T]o show a reasonable belief that probable cause existed, the officer need only show arguable probable cause. To be immune from suit, then, a defendant need only show that there was arguably a probability that the arrestee committed a crime." *Donovan v. Briggs*, 250 F. Supp. 2d 242, 259 (W.D.N.Y. 2003) (quotation, citation, and italics omitted). "Arguable probable cause" exists where state officials "of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (quotation omitted); *see Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) ("Arguable probable cause exists if either (a) it was objectively reasonable for the [state official] to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." (quotation omitted)).

For the following reasons, the Court concludes that, even construing the evidence in the light most favorable to Plaintiffs, (1) Defendants Wright, Abril, and Benjamin all had arguable probable cause to believe that Plaintiffs had committed a crime; and (2) no reasonable jury could find that Defendants Holder or Low initiated or continued the criminal proceedings brought against Plaintiffs. Plaintiffs therefore cannot prevail on their claims against Wright, Abril, and Benjamin, because they are entitled to qualified immunity, and cannot prevail on their claims against Holder and Low due to their inability to prove the first element of malicious prosecution. The Court

therefore grants summary judgment to Holder, Low, Wright, Abril, and Benjamin on Plaintiffs' malicious prosecution claims.[18]

### A. Defendants Wright, Abril, and Benjamin Had Arguable Probable Cause to Believe that Plaintiffs Committed Larceny

#### 1. Relevant Facts

Viewed in the light most favorable to Plaintiffs, the circumstances under which Defendants Wright, Abril, and Benjamin came to learn of Plaintiffs' taking of the air conditioners were as follows. On February 25, 2013, Plaintiffs arrived at the Kingsland Warehouse, where they encountered Holder. (Defs.' 56.1, ¶ 20; Pls.' 56.1, ¶ 20; Fleurimond Dep., Dkt. 60-1, at ECF 482.) Although Holder formally worked as a Records Aide for DOHMH (Defs.' 56.1, ¶ 10), Plaintiffs believed that Holder was a DOHMH supervisor who had authority to determine which items should remain in or be removed from the Kingsland Warehouse, based on paperwork Plaintiffs had received in the past identifying Holder as a supervisor (Fleurimond Dep., Dkt. 60-1, at ECF 495–96). Holder called Abril to tell her that Plaintiffs were at the Kingsland Warehouse to pick up supplies (Defs.' 56.1, ¶ 5), and Abril directed Low to go to the Kingsland Warehouse to help Plaintiffs transport items (Abril Dep., Dkt. 60-3, at ECF 683; Defs.' 56.1, ¶ 24).

While Plaintiffs were waiting for Low on the loading dock at the Kingsland Warehouse (*id.* ¶ 25), Plaintiffs noticed stacks of air conditioners (*id.* ¶ 26) and Fleurimond asked Holder if he could take a few of them home for personal use (Fleurimond Dep., Dkt. 60-1 at ECF 486). Holder replied that the air conditioners were going into the garbage anyway and that Plaintiffs could

---

[18] Because these grounds provide a sufficient basis for granting Defendants summary judgment on Plaintiffs' malicious prosecution claims, the Court does not address Defendants' other arguments as to malicious prosecution. *See Wang v. State Univ. of N.Y. Health Sci. Ctr. at Stony Brook*, 470 F. Supp. 2d 178, 189–90 (E.D.N.Y. 2006) (declining to address alternative reason to dismiss claim where the court granted summary judgment to defendants on separate grounds).

therefore take as many of the air conditioners home as they wanted. (*Id.* at ECF 486, 538.) Plaintiffs then loaded several air conditioners into each of their work vans with Holder's help. (Defs.' 56.1, ¶¶ 30–31; Fleurimond Dep., Dkt. 60-1, at ECF 490.) Low then arrived at the Kingsland Warehouse, where he observed the air conditioners in Plaintiffs' work vans, but did not raise any issue with Plaintiffs. (Defs.' 56.1, ¶¶ 32–34; Pls.' 56.1, ¶ 34.) After Plaintiffs left the Kingsland Warehouse, Low contacted Wright and told him about the air conditioners that he had seen in Plaintiffs' work vans. (Defs.' 56.1, ¶ 36.) Wright called Abril and told her that Low had observed the air conditioners in Plaintiffs' work vans. (Abril Dep., Dkt. 60-3, at ECF 682–83.)

Wright then called Fleurimond and told him to return the air conditioners to the Kingsland Warehouse. (Defs.' 56.1, ¶ 39.) During the call, Fleurimond informed Wright that Holder had given Plaintiffs permission to take the air conditioners, to which Wright responded that "they found out you guys weren't supposed to take them, so bring them back." (Fleurimond Dep., Dkt. 60-1, at ECF 498–99.) After calling Digiosa to tell him that the air conditioners needed to be returned, Fleurimond called Wright back. (*Id.*) Wright advised Plaintiffs to bring the air conditioners back to the Kingsland Warehouse the following morning instead of trying to bring them back that same day. (*Id.*) After Plaintiffs finished work for the day, they traveled to their respective homes in their DOHMH work vans, where the air conditioners remained overnight. (Defs.' 56.1, ¶¶ 41–42; Fleurimond Dep., Dkt. 60-1, at ECF 497.) Plaintiffs returned the air conditioners to the Kingsland Warehouse the following morning, February 26, 2013. (Defs.' 56.1, ¶ 43.)

On February 25, 2013, after confirming that the air conditioners were not supposed to be removed but before the air conditioners were returned (Abril Dep., Dkt. 60-3, at ECF 683–84), Abril contacted Benjamin and informed her "about the missing air conditioners" (Defs.' 56.1,

¶ 40). Benjamin told Abril to file a report with DOHMH police. (Abril Dep., Dkt. 60-3, at ECF 684.) Although Abril learned the next day before contacting DOHMH police that Plaintiffs had returned the air conditioners (*id.*), she went ahead and reported Plaintiffs' removal of the air conditioners (Defs.' 56.1, ¶ 44). After reporting the incident to DOHMH police, Abril told Benjamin that the air conditioners had been returned. (Abril. Dep., Dkt. 60-3, at ECF 684.) Benjamin nonetheless instructed Abril to file a criminal complaint with the NYPD. (Defs.' 56.1, ¶ 46; Abril Dep., Dkt. 60-3, at ECF 684.)

2.    Analysis

While, from *Plaintiffs'* perspective, the initiation of prosecution against them seems unjustified, the Court finds that, even construing the facts in the light most favorable to Plaintiffs, there existed arguable probable cause for Wright Abril, and Benjamin to believe that Plaintiffs had committed a crime at the time Defendant Abril reported the incident to the NYPD. "Probable cause—let alone arguable probable cause, which is all that [the Court] need determine—does not require that the person act on accurate information, but simply that the information be 'reasonably trustworthy' and 'sufficient to warrant a person of reasonable caution in the belief that arrest . . . is necessary.'" *Vallen v. Connelly*, 185 F. App'x 22, 24 (2d Cir. 2006) (summary order) (quoting *O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir. 1993)).

Here, Defendants Wright, Abril, and Benjamin—to the extent they participated in the prosecution of Plaintiffs—acted on reasonably trustworthy information in doing so and had at least arguable probable cause to believe that Plaintiffs had committed larceny. "A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof." N.Y. Penal Law § 155.05(1). Plaintiffs do not dispute that they removed the air

conditioners from the Kingsland Warehouse with the intent to take them home for their personal use (Defs.' 56.1, ¶¶ 30–31), but instead argue that there was no probable cause or even arguable probable cause to believe that Plaintiffs had committed larceny. (*See* Plaintiffs' Opposition Brief ("Pls.' Opp."), Dkt. 58, at ECF 403–08.) Specifically, Plaintiffs argue that Defendants could not have reasonably believed that Plaintiffs committed this offense because Defendants knew, or should have known, that (1) Plaintiffs subjectively believed that they were allowed to take the air conditioners and thus had no intent to deprive DOHMH of its property; (2) the air conditioners never left DOHMH work vans; and (3) Plaintiffs returned the air conditioners the following morning as instructed by Wright to do so. (*Id.*) The Court disagrees.

First, even if Defendants Wright, Abril, and Benjamin were all aware that Plaintiffs maintained that Defendant Holder had given them permission to take the air conditioners, these Defendants could have nevertheless reasonably believed that Plaintiffs were lying, given that Holder consistently denied telling Plaintiffs that they could take the air conditioners. Indeed, at deposition, Defendant Abril explained that when she learned that Plaintiffs said that Defendant Holder gave them permission to take the air conditioners, she "asked [Holder] if he gave them permission and he said no." (Abril Dep., Dkt. 60-3, at ECF 690.) Thus, Abril could have simply credited Holder's version of events over that of Plaintiffs. *See Bonds v. City of New York*, No. 12-CV-1772 (ARR) (MDG), 2014 WL 2440542, at *7 (E.D.N.Y. May 30, 2014) ("In order to raise a triable issue of fact on the probable cause element, [a] plaintiff cannot simply rely on his testimony denying that he committed the criminal offense for which [he was] arrested and charged []."); *Brown v. City of New York*, No. 08-CV-5095 (FB) (MDG), 2013 WL 1338785, at *4 (E.D.N.Y.

Apr. 1, 2013) ("Courts have repeatedly determined that a plaintiff's own testimony is insufficient to rebut the presumption of probable cause.").[19]

Second, even if Wright, Abril, and Benjamin were aware that the air conditioners never left Plaintiffs' work vans and that Plaintiffs returned them the following day at Wright's request, they still could have reasonably believed that Plaintiffs had committed larceny. For purposes of New York's larceny statute,

> "[d]eprive" means (a) to withhold it or cause it to be withheld permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to [the owner], or (b) to dispose of the property in such manner or under such circumstances as to render it unlikely that an owner will recover such property.
>
> To "appropriate" property of another to oneself or a third person means (a) to exercise control over it, or to aid a third person to exercise control over it, permanently or for so extended a period or under such circumstances as to acquire the major portion of its economic value or benefit, or (b) to dispose of the property for the benefit of oneself or a third person.

*Dyal v. Adames*, No. 16-CV-2133 (JBW), 2018 WL 2103202, at *3 (E.D.N.Y. May 7, 2018) (citing N.Y. Penal Law § 155.00(3), (4)) (quotations and italics omitted). The New York Court of Appeals has interpreted the taking element of New York Penal Law § 155.00 as follows:

---

[19] Furthermore, even if these Defendants thought that Holder, in fact, had told Plaintiffs they could take the air conditioners, Abril, Benjamin, and Wright still could have reasonably concluded that Plaintiffs lied about believing that Holder had the authority to grant permission and that Plaintiffs were using this toothless permission to conceal their intent to steal the air conditioners. *See People v. Zona*, 928 N.E.2d 1041, 1045 (N.Y. 2010) (noting that a criminal defendant asserting that he had permission to take an item would only be insulated from liability for larceny if he had "a good faith belief that the property was appropriated under a claim of right" (quotation omitted)). Although Plaintiff Fleurimond testified in his deposition that he believed Holder had the authority based on letters that Fleurimond had seen identifying Holder as a supervisor, the letters themselves are not in evidence, and Defendants dispute that Holder was Plaintiffs' supervisor or had the authority to give away DOHMH property. (*See* Defendants' Reply 56.1 Statement, Dkt. 57, ¶ 21.) In determining whether Defendants Abril, Benjamin, and Wright are entitled to qualified immunity, the Court is not required to accept Plaintiffs' self-serving, unsupported claim that they (Plaintiffs) believed that Holder had the authority to give them permission to take the air conditioners. *See Bonds*, 2014 WL 2440542, at *7.

a shoplifter who exercises dominion and control over the goods wholly inconsistent with the continued rights of the owner can be guilty of larceny even if apprehended before leaving the store, a car thief who starts the car can commit larceny before he actually drives the automobile away, and a pickpocket can be guilty of larceny even though his removal of the victim's possessions is interrupted before completion.

*People v. Robinson*, 459 N.E.2d 483, 484 (N.Y. 1983) (citations omitted); *see People v. Hardy*, 43 N.E.3d 734, 739 (N.Y. 2015) ("The taking element of larceny is satisfied by a showing that the thief exercised dominion and control over the property for a period of time, however temporary, in a manner wholly inconsistent with the owner's continued rights." (quotations omitted)). Thus, even knowing that Plaintiffs had only taken the air conditioners for a short period of time, Defendants Wright, Abril, and Benjamin still could have reasonably believed that this conduct constituted larceny. *Walczyk*, 496 F.3d at 154 (explaining that arguable probable cause exists where state officials "of reasonable competence could disagree on the legality of the action at issue in its particular factual context" (quotation omitted)).

Similarly, even assuming *arguendo* that these Defendants knew that the air conditioners never left Plaintiffs' DOHMH vans, this fact would not render their belief that Plaintiffs had stolen the air conditioners and intended to keep them any less reasonable. As New York Penal Law § 155.00 indicates, a person commits larceny by exercising control over the stolen property "under such circumstances as to acquire the major portion of its economic value or benefit"; there is no requirement that the person exercise that control in or on the person's own property. Furthermore, although the air conditioners remaining in the vans could be evidence of Plaintiffs' lack of intent to steal the units and their intent to return them, it was nonetheless reasonable for Defendants to conclude otherwise, *e.g.*, that the units only remained in the vans because Plaintiffs were caught before they could transport or otherwise dispose of them and that the presence of the units in the vans simply corroborated Plaintiffs' original intent to steal them. For the same reason, Defendants

Wright, Abril, and Benjamin's knowledge that Plaintiffs returned the air conditioners at Wright's direction does not undermine the reasonableness of their belief that Plaintiffs' original intent was to steal them and that Plaintiffs only returned the units because the theft was discovered and Wright confronted them about it. *Walczyk*, 496 F.3d at 154.

Accordingly, the Court determines that Wright, Abril, and Benjamin all had at least arguable probable cause to believe that Plaintiffs committed larceny.[20] The Court therefore grants summary judgment to Defendants Wright, Abril, and Benjamin on Plaintiffs' malicious prosecution claims against them.

---

[20] Where, as here, a grand jury has returned an indictment corroborating the criminal charges, the following standard applies:

> A grand jury indictment gives rise to a presumption that probable cause exists and a claim for malicious prosecution is thereby defeated. The presumption may be rebutted by wrongful acts on the part of [a state official], including fraud, perjury, or the suppression of the evidence. For example, when [a state official] provides false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the [state official's] initial, potentially tortious behavior. But if the prosecution relied on independent, untainted information to establish probable cause, a complaining official will not be responsible for the prosecution that follows.

*Rentas v. Ruffin*, 816 F.3d 214, 220–21 (2d Cir. 2016) (quotations, alterations, and citations omitted).

The Court notes that, of Defendants Wright, Abril, and Benjamin, Plaintiffs only allege that Abril testified before the grand jury (Pls.' 56.1, ¶ 53), and Plaintiffs point to no evidence suggesting that she did so in a perjurious or fraudulent manner. Indeed, in her complaint to the NYPD on March 1, 2013, Abril disclosed that the air conditioners had already been returned. (NYPD Complaint Report, Dkt. 55-7, at ECF 307–08.) Thus, even beyond the existence of arguable probable cause, the presumption of *actual* probable cause also applies in this case and has not been rebutted. *See Stukes v. City of New York*, No. 13-CV-6166 (NGG) (VVP), 2015 WL 1246542, at *5 (E.D.N.Y. Mar. 17, 2015) (dismissing malicious prosecution claim where the plaintiffs adduced no evidence that defendants "fail[ed] to disclose evidence" to law enforcement and/or the prosecutor "that would [have] conclusively establish[ed] [plaintiffs'] innocence" or "negate the possibility that [the plaintiffs] had committed the crime" (quotations omitted)).

**B. Defendants Holder and Low Did Not Initiate or Continue Criminal Proceedings Against Plaintiffs**

1. Relevant Facts

Viewed in the light most favorable to Plaintiffs, Defendants Holder's and Low's involvement in Plaintiffs' prosecution was as follows. On March 1, 2013, Defendant Abril went to the NYPD's 94th Precinct and made a complaint about the removal of the air conditioners from the Kingsland Warehouse. (*Id.* ¶ 46; Abril Dep., Dkt. 60-3, at ECF 684.) NYPD officers then spoke to Holder and Low as part of an investigation into the alleged crime. (Defs.' 56.1, ¶ 48.) As part of the investigation, Low told law enforcement that Holder observed Plaintiffs drive away with the stolen air conditioners. (NYPD Complaint Report, Dkt. 55-7, at ECF 308.) Low also told law enforcement that Plaintiffs were employed by DOHMH and were known for taking things in the past (*id.*), even though neither Fleurimond nor Digiosa had ever stolen anything from DOHMH (Pls.' 56.1, ¶¶ 49, 69). Additionally, Low told law enforcement that Plaintiffs returned the stolen air conditioners after being confronted by a supervisor. (NYPD Complaint Report, Dkt. 55-7, at ECF 308.) Finally, Low stated that Plaintiffs took advantage of the fact that surveillance cameras were recently removed from the Kingsland Warehouse (*id.*), even though there was no credible basis on which Low could think that Plaintiffs knew that the surveillance cameras at issue were destroyed during Hurricane Sandy (Pls.' 56.1, ¶ 80). Holder testified at deposition that he went over to DOHMH's main office to meet with police and that they asked him what happened on the day the air conditioners were taken and that he answered their questions. (Holder Dep., Dkt. 60-2, at ECF 661.)

Plaintiffs were arrested on March 15, 2013. (Defs.' 56.1, ¶ 50; NYPD Arrest Reports, Dkt. 55-8, at ECF 313–18.) That same day, the Kings County District Attorney's Office charged Plaintiffs with Attempted Criminal Possession of Stolen Property in the Third, Fourth and Fifth

degrees.  (*Id.* ¶ 52.)  The charging instrument was signed by NYPD Detective John Gipson, on information from DOHMH Investigator Lloyd and Defendants Low and Holder.  (*Id.*)  The Kings County District Attorney's Office then presented Plaintiffs' criminal case to a grand jury, before which Holder and Low both testified.  (*Id.* ¶ 53.)

        2.   <u>Analysis</u>

Under these facts, the Court concludes that no reasonable jury could conclude that either Defendant Holder or Defendant Low initiated or continued the criminal proceedings against Plaintiffs—the first element of a malicious prosecution claim.  With respect to the initiation requirement of a malicious prosecution claim, the Second Circuit has held that "in order for an individual to 'initiate' a prosecution for these purposes, the mere reporting of a crime to police and giving testimony are insufficient; it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act."  *Rohman v. N.Y.C. Transit Auth. (NYCTA)*, 215 F.3d 208, 217 (2d Cir. 2000) (quotations and brackets omitted); *see also Rothstein v. Carriere*, 373 F.3d 275, 293 (2d Cir. 2004) ("A plaintiff in a malicious prosecution case must prove that the defendant initiated the criminal proceeding. As we have stated before, reporting a crime to law enforcement and giving testimony does not constitute the 'initiation' of a criminal prosecution.").

At the outset, the Court notes that neither Holder's nor Low's testimony in front of the grand jury can provide a factual basis on which a reasonable jury could find that they initiated any criminal proceedings against Plaintiffs.  *See Rehberg v. Paulk*, 566 U.S. 356, 369 (2012) ("[W]e conclude that grand jury witnesses should enjoy the same immunity as witnesses at trial.  This means that a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony."); *Coggins v. Buonara*, 776 F.3d 108, 113 (2d Cir. 2015) ("When a [state

official] claims absolute immunity for his grand jury testimony under *Rehberg*, the court should determine whether the plaintiff can make out the elements of his § 1983 claim without resorting to the grand jury testimony."). Without the grand jury testimony, all Plaintiffs can point to in support of their contention that Holder and Low initiated criminal proceedings against Plaintiffs are the statements that Holder and Low made to authorities as part of the investigation into the alleged crime. (Defs.' 56.1, ¶¶ 48, 52.)

Even if a reasonable jury concluded that Holder and Low knowingly provided false information during the course of the NYPD's investigation, it still could not find that Holder and Low had initiated the prosecution of Plaintiffs. A prosecutor is presumed to "exercise independent judgment in deciding whether to initiate and continue a criminal proceeding, . . . [unless it is] demonstrate[d] that the defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Espada v. Schneider*, 522 F. Supp. 2d 544, 553 (S.D.N.Y. 2007) (quotations and citation omitted). Recent authority in this Circuit suggests that knowingly providing false information to law enforcement and/or prosecutors does not necessarily suffice to meet this standard. Specifically, in *Watkins v. Sims*, 648 F. App'x 49, 52 (2d Cir. 2016) (summary order),[21] the plaintiff argued that the defendants had initiated or continued the criminal proceedings against him by knowingly providing false information to prosecutors. *Watkins*, 648 F. App'x at 51–52. Rejecting this argument, the Second Circuit panel reasoned:

> Assuming, *arguendo*, that [the defendants] provided false or misleading information to the prosecution during its investigation, we find no evidence, viewing the record in the light most favorable to [the plaintiff], from which a reasonable jury could conclude that either [defendant] took an active role in [the

---

[21] *See Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011) (noting that "denying summary orders precedential effect does not mean that the court considers itself free to rule differently in similar cases" (quotation and brackets omitted)).

plaintiff's] criminal prosecution. [The plaintiff] claim[ed] that [one defendant], in response to document requests from the District Attorney's ("DA") office, 'deluged' the DA with unsolicited information, but he points to only two documents that [the defendant] provided that fell outside the scope of the request. No reasonable jury could conclude on the basis of that evidence that [the defendant]'s conduct went beyond the mere provision of information to the point where [the defendant] encouraged or importuned the DA's office to prosecute [the plaintiff]. There is similarly no evidence supporting the inference that [the other defendant] encouraged or importuned the DA's office to act when he met with its employees in December 2005.

*Id.* at 52.

So too here. Assuming, *arguendo*, that Defendants Holder and Low knowingly provided false information to law enforcement and/or prosecutors, Plaintiffs adduce no evidence on which a reasonable jury could conclude that Holder or Low initiated the filing of the criminal complaint,[22] provided more inculpatory information to the authorities than was requested of them, or "encouraged or importuned" the District Attorney's office to prosecute Plaintiffs. *Watkins*, 648 F. App'x at 52; *see Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) ("[I]f [the plaintiff] had claimed only that [the defendant] fabricated evidence and did nothing to precipitate the sequence of events that resulted in a deprivation of [the plaintiff's] liberty, no constitutional violation would have been alleged."); *Carter v. Port Auth. of N.Y. & N.J.*, No. 03-CV-8751 (DLC), 2004 WL 2978282, at *8 (S.D.N.Y. Dec. 20, 2004) (granting summary judgment on a malicious prosecution claim against an officer who filled out a witness statement that "was not one of the required documents to initiate criminal process").

The Court recognizes that there is a conflicting line of cases that have held that "[g]iving information to the police that is known to be false qualifies as the commencement of the

---

[22] *Cf. Cunninham v. New York City*, No. 04-CV-10232 (LBS), 2007 WL 2743580, at *5 (S.D.N.Y. Sept. 18, 2007) ("In the present action, Officer Rollins initiated the robbery prosecution by filing the charges of second-degree attempted robbery against the plaintiffs.").

prosecution" for purposes of a malicious prosecution claim, *Rivers v. Towers, Perrin, Forster & Crosby Inc.*, No. 07-CV-5441 (DGT) (RML), 2009 WL 817852, at *3 (E.D.N.Y. Mar. 27, 2009), or, at least, can qualify as commencement of the prosecution, *see, e.g., Estiverne v. Esernio-Jenssen*, 581 F. Supp. 2d 335, 348 (E.D.N.Y. 2008) ("Merely giving false information to the authorities does not constitute initiation of the proceeding without an additional allegation or showing that, at the time the information was provided, the defendant knew it to be false, yet still gave it to the police or District Attorney." (quotation omitted)); *see also Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 199–200 (2d Cir. 2014) (approvingly citing district court case with the following quoted text in a parenthetical: "Giving information to the police that is known to be false qualifies as the commencement of a prosecution."). The Court is nevertheless persuaded by *Watkins*—the facts of which more closely resemble those presented here than those in *Rivers*, *Estiverne*, and *Stampf*—and holds that that Holder's and Low's alleged provision of false information to the NPYD does not qualify as the commencement of prosecution for purposes of Plaintiffs' malicious prosecution claims.[23]

Accordingly, the Court concludes that Plaintiffs cannot prove that Holder or Low initiated or continued the criminal proceedings against them, which is the first element of a malicious prosecution claim. *See TADCO Constr. Corp. v. Dormitory Auth. of State of N.Y.*, 700 F. Supp. 2d 253, 270 (E.D.N.Y. 2010) (dismissing malicious prosecution claim where plaintiff could not show that defendants "actively engaged in [plaintiff's] prosecution"); *cf. Shattuck v. Town of Stratford*, 233 F. Supp. 2d 301, 314 (D. Conn. 2002) ("[A defendant can] be liable [] for § 1983

---

[23] Notably, in *Stampf*, the defendant (who provided false information) was the first individual to initiate contact with the police to report the crime, *see* 761 F.3d at 196–97, which neither Holder nor Low did in this case. (*See* Defs.' 56.1, ¶ 46; Abril Dep., Dkt. 60-3, at ECF 684 (noting that Abril made the initial complaint to the NYPD about the missing air conditioners at Benjamin's request).)

malicious prosecution . . . even though she did not apply for the arrest warrants, if the plaintiffs [can] show that she had initiated or instigated the proceedings against them by contacting the police and then encouraging their prosecution."). The Court therefore grants summary judgment to Defendants Holder and Low on Plaintiffs' malicious prosecution claims against them.

## II.    Municipal Liability

"A municipality may be liable under § 1983 only if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quotations omitted). "[T]he elements of a *Monell* claim include: 1) an official policy or custom that, 2) causes the plaintiff to be subjected to, 3) a deprivation of a constitutional right." *Musso v. City of New York*, No. 05-CV-2511 (RRM) (JO), 2008 WL 3200208, at *4 (E.D.N.Y. July 24, 2008) (citing *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1987)). To demonstrate an official policy or custom, a plaintiff must show "the existence of a formal policy which is officially endorsed by the municipality," or a practice that is "so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or that a municipal custom, policy, or usage can be inferred from the evidence of deliberate indifference of supervisory officials as to such abuses." *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015) (summary order) (citing *Jones v. Town of East Haven*, 691 F.3d 72, 80–81 (2d Cir. 2012)).

In support of their municipal liability claim against Defendant City of New York, Plaintiffs argue that "[t]he City of New York's failure to adequately train their DOHMH laborers in the proper procedure for handling and removing salvage directly cause[d] the violation of [P]laintiffs' constitutional rights under § 1983." (Pls.' Opp., Dkt. 58, at ECF 410–11.) "When a *Monell* claim relies on the theory that the municipality failed to train certain employees about their legal duty to

avoid violating individuals' rights," the plaintiff is required to demonstrate "that the municipality's failure to train its employees in a relevant respect amounted to deliberate indifference to the rights of the persons with whom the untrained employees came into contact." *Alwan v. City of New York*, 311 F. Supp. 3d 570, 578 (E.D.N.Y. 2018) (quotations and alterations omitted). The Second Circuit has established three requirements for such claims:

> First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation. Thus, a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events.
>
> Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. . . . A choice might [] be difficult where, although the proper course is clear, the employee has powerful incentives to make the wrong choice.
>
> Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992) (citations omitted).

Applying this standard, the Court concludes that Plaintiffs have failed to adduce sufficient evidence to permit a reasonable jury to find Defendant City of New York liable under § 1983. Even assuming, *arguendo*, that Plaintiffs could sufficiently demonstrate that their constitutional rights were violated, they have not sufficiently connected that constitutional violation to Defendant City of New York. As for the first and second requirements of the test established in *Walker*, Plaintiffs adduce no evidence demonstrating that DOHMH employees routinely confront situations in which they are unsure as to whether DOHMH property can be taken by employees for personal use, and evidence from the record suggests that most DOHMH employees would reasonably determine that doing so would be inappropriate. (*See generally* Arbitration Opinion & Award, Dkt. 55-12 (determining that, by removing the air conditioners from the Kingsland

Warehouse, Plaintiffs' violated DOHMH Department Rule 3.25, which covers "[c]onduct prejudicial to good order and discipline").)

Indeed, it seems obvious, regardless of the work setting, that employees would know that they should not be taking their employers' property to use or dispose of for their own benefit, at least without clear and proper authorization. That Plaintiffs argue that there was uncertainty about whether Defendant Holder, in particular, had such authority does not suggest or create the kind of uncertainty or moral dilemma for employees that might give rise to a failure to train claim. As for the third requirement of the *Walker* test, Plaintiffs present no evidence suggesting that, in the absence of appropriate training, constitutional violations of the sort that they allege would occur frequently. Therefore, no reasonable jury could find that any policymaker acting on behalf of Defendant City of New York "should have known that inadequate training or supervision was 'so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Walker*, 974 F.2d at 298 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Accordingly, the Court grants summary judgment in favor of Defendant City of New York on Plaintiffs' municipal liability claim against it.

## CONCLUSION

For the reasons stated above, the Court grants Defendants' motion for summary judgment in its entirety and dismisses this action. The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*                          
Pamela K. Chen
United States District Judge

Dated: August 21, 2019
      Brooklyn, New York